UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X       <u>For Online Publication Only</u>
MARK YOUNG,

                                Plaintiff,

                -against-                                             **<u>MEMORANDUM & ORDER</u>**
                                                                     14-CV-3860 (JMA)
NANCY A. BERRYHILL,[1]
*Acting Commissioner of Social Security*,

                                Defendant.
------------------------------------------------------------X
**APPEARANCES:**

Maria C. Makis
Office of Robert Koenigsberg
305 Broadway, Suite 800
New York, NY 10007
        *Attorney for Plaintiff*

Vincent Lipari
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
        *Attorney for Defendant*

**AZRACK, United States District Judge:**

        Plaintiff Mark Young challenges the conclusion of the Acting Commissioner of Social

Security, reached after a hearing before an Administrative Law Judge, that plaintiff is neither

disabled for purposes of receiving disability insurance benefits under Title II of the Social Security

Act nor eligible for Supplemental Security Income ("SSI") payments under Title XVI of the Social

Security Act.  The case is before the Court on the parties' cross-motions for judgment on the

---

[1] Nancy A. Berryhill became Acting Commissioner of the Social Security Administration on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn Colvin as the defendant in this suit.

pleadings.  In the alternative, plaintiff has requested that the Court remand the case with directions to fully develop the record.  Because the Administrative Law Judge's decision was supported by substantial evidence and applied the proper legal standards, the defendant's motion for judgment on the pleadings is GRANTED, and the plaintiff's cross-motion is DENIED.

## I.  BACKGROUND

### A. Procedural History

On July 20, 2011, plaintiff filed for disability insurance benefits and supplemental security income with the Social Security Administration ("SSA"), alleging that his disability began on June 1, 2010.  (Administrative Transcript ("Tr.") 163.)  On October 6, 2011, the SSA denied plaintiff's disability application.  (Id. at 72–74.)  On November 16, 2011, plaintiff filed a written request for a hearing.  (Id. at 22.)  On February 8, 2013, plaintiff appeared at a hearing before Administrative Law Judge Joseph Rose (the "ALJ").  (Id. at 65–68.)  The ALJ granted plaintiff's motion for a continuance of the hearing on February 14, 2013, in order to allow plaintiff's newly acquired counsel to submit additional evidence and the ALJ to review any such evidence.  (Id.)  On February 14, 2013, the ALJ held a hearing where plaintiff testified in person.  (Id. at 35–63.)  In addition, at the hearing, a vocational expert ("VE") testified in person.  Plaintiff argued that a combination of physical and psychiatric impairments rendered him disabled.  (See id. at 48–56.)

On March 18, 2013, the ALJ found that plaintiff was not disabled.  (Id. at 19–30.)  On April 18, 2014, the Appeals Council denied review of the ALJ's decision.  (Id. at. 1–3.)  Plaintiff then filed this action pursuant to 42 U.S.C. § 405(g).

### B. Plaintiff's Background and Testimony

Plaintiff was born in April 1959 and was fifty-three years old on the date of the hearing before the ALJ.  (Id. at 50, 163.)  Plaintiff completed eleventh grade, but has not received a diploma

or GED.  (Id. at 50.)  Plaintiff last worked as a truck driver from 2000 to 2001, 2003 to 2006, and in 2010.  (Id. at 46–47.)  Plaintiff stopped working after an accident on June 2, 2010, when he fell asleep while driving and struck the rear end of another car, causing a passenger in that car to suffer a heart attack and die.  (Id. at 40.)  Prior to the accident, plaintiff had a history of heavy, daily alcohol and cocaine abuse since he was a teenager.  (Id. at 301.)  Following the accident, he attended detox and rehabilitation for drugs and alcohol and now denies using these substances. (Id.)  After the accident, plaintiff also became homeless.  (Id. at 40.)  Plaintiff was convicted of involuntary manslaughter and incarcerated for nine months, followed by ten years probation.  (Id. at 46.)  As explained further below, plaintiff suffers from hereditary multiple osteochondromas, formerly called hereditary multiple exotoses, a condition characterized by growths of multiple "benign cartilage-capped bone tumors that grow outward from the metaphyses of long bones." (Id. at 41; Comm'r Mot. J. Pleadings,  Dec. 5, 2014, ECF No., 3. (citing Wim Wuyts et. al., *Multiple Hereditary Osteochondromas*, NCBI GENE REVIEWS, https://www.ncbi.nlm.nih.gov/books/NBK1235/.)

Plaintiff completed an SSA function report on August 10, 2011.  (Tr. 223.)  In the report, plaintiff stated that he lived in a shelter and therefore did not need to complete house or yard work. (Id. at 226.)  He claimed that he prepared meals daily and did not need help or reminders to take care of his personal needs or grooming.  (Id. at. 225.)  He stated that he did not drive, but used public transportation daily and could go out alone.  (Id.)  He also asserted that he shopped every day for ten minutes for simple food preparations.  (Id. at 227.)  Plaintiff stated that he spent time with others every day and went to church and Narcotics Anonymous meetings every other day. (Id. at 228.)  He further reported that he had no problem getting along with family and friends. (Id.)  Plaintiff claimed that burning pain in his legs, hips, and arms had affected his activities for his entire life.  (Id. at 231–32.)  He also noted that he felt this pain every day, and that it lasted for two minutes and was precipitated by walking or standing.  (Id. at 232.)  He relieved the pain by

sitting down.  (Id. at 233.)  Plaintiff indicated that he could walk for fifteen minutes without stopping and then needed to rest for twenty minutes before he could continue.  (Id. at 230.) Plaintiff also asserted that he suffered from mental anxiety, brought about by the memory of his accident.  (Id. at 234.)  He alleged that he experienced panic attacks every day and the effects lasted for about thirty minutes.  (Id.)  He indicated that he was unable to do activities, such as shopping or driving, during an attack, and needed time to recover even after the symptoms had lessened.  (Id.)  He reported that he was taking Celexa and Ambien to treat this condition.  (Id.) Plaintiff indicated that he did not have problems paying attention, but did have trouble with his short-term memory.  (Id.)

     At the February 2013 hearing, plaintiff testified before the ALJ.  Plaintiff's counsel first shared that they had brought a series of x-rays that plaintiff believed showed the tumors in his pelvis, legs, and arms; however, they did not have a medical expert present to interpret the x-rays. (Id. at 38.)  The ALJ stated that he would be unable to interpret the x-rays on his own.  (Id.)  He offered to allow plaintiff to "extrapolate an opinion" from an expert or to instruct the SSA to order another examination of the claimant, in which they could "pontificate [plaintiff's] limitations" based on the images.  (Id.)  Plaintiff's counsel responded that "there [was] a lot of evidence in the record concerning the tumors," so he felt "that it probably would not be necessary to supplement the record with anything given the fact that there [was] already a lot there."  (Id.)

     In his testimony, plaintiff asserted that his largest problem was the "disabilititating [sic] burning" caused by tumors on his bones, which he experienced when sitting down, standing up, moving, and walking.  (Id. at 48.)  He stated that he experienced this pain about fifteen to twenty times every day.  (Id. at 49, 52.)  He further asserted that he did not have to be participating in an activity for the pain to occur.  (Id. at 52.)  Plaintiff rated his pain as a 7.5 or 8 out of 10.  (Id.)

Plaintiff testified that he also suffered from mental anxiety and depression caused by flashbacks to his accident that occurred fifteen to twenty times every day.  (Id. at 51–54.)  He stated that these flashbacks affected his ability to concentrate and caused him to suffer from posttraumatic stress disorder and experience deep depression constantly throughout the day.  (Id. at 54–55.)

Finally, plaintiff explained that his left, non-dominant shoulder had been dislocated for five years, following a slip and fall accident in a hotel.  (Id. at 52–53.)  He alleged that this injury caused him a lot of pain when he reached behind his neck or tried to grab an item above him.  (Id. at 53.)

Due to his impairments, plaintiff testified that he was not capable of "lift[ing] or carrying 20 pounds occasionally . . . [or] 10 pounds frequently during an eight-hour workday."  (Id. at 56.)  He further reported that he could not stand six hours out of an eight-hour workday because he was constantly debilitated.  (Id.)  Plaintiff stated that his conditions had not improved because he was unable to see a doctor or receive medication, partially due to his lack of income and assets.  (Id. at 55–56.)

## C. Medical Evidence from Providers Concerning Plaintiff's Limitations

### 1. Institute for Family Health

#### a.  Physical Limitations

In May 2011, the Institute for Family Health conducted a FEGS Biopsychosocial ("BPS") evaluation and developed a FEGS WeCARE Rehabilitation Plan and a FEGS Comprehensive

Services Plan for plaintiff.[2]  (Id. at 467–548.)  The Rehabilitation Plan identified several diagnoses affecting plaintiff's employment, including: (1) "recurrent pain in mult[iple] bones, [without] functional deficits by exam"; (2) alcohol and cocaine abuse in remission; and (3) post-traumatic stress disorder.  (Id. at 469.)  The Plan indicated that plaintiff had been homeless for one year.  (Id. at 494.)  The Comprehensive Services Plan indicated that plaintiff could participate in thirty-five hours of vocational services.  (Id. at 493.)  The BPS Summary noted that plaintiff was able to complete daily activities, such as cleaning, shopping, and grooming himself.  (Id. at 508.)  The Summary also reported that plaintiff had multiple osteochondromas removed from his femurs and forelegs as a child and suffered from a condition causing tumors to grow on his bones since birth. (Id. at 515, 540.)  Plaintiff was referred to Sidney Hillman Family Practice in order to analyze his residual functional capacity.  (Id. at 470.)

### b. Mental/Psychiatric Limitations

The Comprehensive Services Plan also concluded that plaintiff's BPS barriers to employment were medical and mental health conditions, lack of education and training, lack of housing, legal history, and a history of substance abuse.  (Id. at 481.)  The Plan reported that plaintiff complained of insomnia, recurrent anxious mood, periodic lack of motivation, intrusive thoughts, and flashbacks.  (Id. at 492.)  The BPS Summary stated that plaintiff was depressed due to his legal problems.  (Id. at 507.)  Plaintiff was referred to the Sidney Hillman Family Practice in order to analyze the severity of his psychological limitations.  (Id. at 470.)

---

[2] The Wellness, Comprehensive Assessment, Rehabilitation and Employment (WeCARE) program "helps underserved welfare recipients with health and mental health barriers to employment attain their maximum level of health and self-sufficiency."  (Best Practice: Addressing Health and Mental Health Barriers to Employment, NEW YORK CITY GLOBAL PARTNERS, https://www1.nyc.gov/assets/globalpartners/downloads/pdf/NYC_HRA_WeCare.pdf) Depending on their residence, clients are referred to either FEGS Health and Human Services or Fedcap Rehabilitation Services for a comprehensive BPS assessment.  (Id.)  The assessment determines a client's strengths and functional limitations, and ultimately his employability.  (Id.)

The Institute for Family Health produced another FEGS Wellness Summary from August to October 2011.  (Id. at 549–59.)  This BPS Report concluded that, due to major depression and post-traumatic stress disorder, plaintiff suffered "substantial functional limitations to employment . . . that [would] last for at least twelve months and make the individual unable to work."  (Id. at 553.)  This conclusion was based on the fact that plaintiff's condition had not stabilized according to his treating physician, who did not expect the client to improve within twelve months.  (Id.)

**2. Sidney Hillman Family Practice**

*a. Physical Limitations*

In June 2011, plaintiff began treatment at Sidney Hillman Family Practice.  (Id. at 288.)  On examination by a family nurse practitioner, Mara Tittler, plaintiff appeared "neatly dressed" with a "lumbering walk."  (Id. at 295.)  Ms. Tittler also noted the presence of a "cartilaginous mass clearly felt on [the] lateral aspect of [the] thigh" and a "[s]maller similar mass on [the] left side." (Id.)  She indicated that plaintiff's left leg was shorter than his right, and that he used a homemade lift.  (Id. at 464.)  His primary encounter diagnosis was osteochondropathy.  (Id. at 295.)  Ms. Tittler reported that plaintiff would "require at least one year . . . to stabilize."  (Id. at 465.)

Plaintiff returned to Sidney Hillman on July 6, 2011 and was examined by Dr. Samantha Mekrut.  (Id. at 306.)  Dr. Mekrut noted that he was "well-appearing, cooperative, comfortable, [and] well-groomed."  (Id. at 308.)  She observed that his left shoulder had a "squared off appearance" and a "decreased range of motion."  (Id. at 306.)  Dr. Mekrut noted that plaintiff complained of a burning pain in his thighs, right shoulder, right elbow, and right hip.  (Id. at 307.) She ordered x-rays to examine his left shoulder, and referred him to orthopedics for further management of his osteochrondropathy.  (Id. at 308.)

Plaintiff had a follow-up appointment for shoulder and joint pain on July 28, 2011.  (Id. at 314.)  He rated this pain as a three out of five.  (Id. at 315.)

### b. Mental/Psychiatric Limitations

During the exam, Ms. Tittler also observed that plaintiff had a "flat, depressed affect."  (Id. at 295.)  He was assessed as suffering from post-traumatic stress disorder and was recommended for screening for depression and a consultation with the Social Work department.  (Id.)

Plaintiff was then examined by Nicole Arnold, a licensed mental social worker. Ms. Arnold again noted plaintiff's flat affect and "depressed/deflated" mood.  (Id. at 301.)  She diagnosed plaintiff with post-traumatic stress disorder; major depressive disorder, single episode; and drug-dependence in remission.  (Id. at 302.)  Ms. Arnold assessed plaintiff to have a Global Assessment of Functioning (GAF) score of 56.[3]  (Id. at 302.)

Plaintiff was further examined by Dr. Anastasia Kucharski on July 15, 2011.  (Id. at 311.)  Dr. Kucharski found him to be alert and oriented to person, place, and time, with a depressed mood and constricted affect.  (Id. at 312.)  She noted that he denied "delusions, hallucinations, suicidal and homicidal ideation".  (Id.)  She further observed that his "impulse control, judgment and insight [were] satisfactory."  (Id.)   Plaintiff began taking Celexa and Ambien around this time.  (Id. at 311.)

In a follow-up visit with Dr. Kucharski on September 7, 2011, plaintiff's GAF score was increased to 60, indicating improved functioning, although he remained in the range indicating

---

[3] GAF is a scale that "indicates the clinician's opinion of an individual's psychological, social, and occupational functioning."   Petrie v. Astrue, 412 Fed. App'x 401, 506 n.2 (2d Cir 2011) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 376–77 (4th ed., text revision, 2000)).  "The GAF scale ranges from 0-100," with a lower score indicating more severe limitations.  Id.  A GAF score in the 51-60 range signifies "moderate symptoms or moderate difficulty in social, occupational, or school situations," while scores in the 61-70 range indicate "some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships."  Id.

moderate symptoms.  (Id. at 411.)  He continued to complain of depression and sleep disturbance.  (Id.)  Plaintiff was alert and oriented to person, place, and time, with a depressed and anxious mood and a constricted affect.  (Id.)  His insight, judgment and impulse control were rated as fair.  (Id.)  Dr. Kucharski increased plaintiff's daily dosage of Celexa.  (Id. at 412.)

### 3.  Consultative Examinations

Industrial Medicine Associates also performed consultative physical and psychological examinations on plaintiff.

#### a. Physical Limitations

On September 9, 2011, plaintiff attended a physical consultative examination with Dr. Susie Chow.  Dr. Chow reported that plaintiff claimed that his left shoulder injury resulted from a fall off of a truck in 2007 and that it caused him pain rated an eight and a half out of ten.  (Id. at 325.)  Plaintiff further asserted that the pain increased following changes in the weather and "sleeping awkwardly on the left side."  (Id.)  Dr. Chow observed that there was a "moderate elevation of the AC joint of the left shoulder."  (Id. at 327.)

Plaintiff also stated that his "bone condition of enlarged bones since birth" caused him a burning pain rated a ten out of ten.  (Id. at 325.)  Dr. Chow noted that there were "palpable bony growths" in both elbow regions.  (Id. at 328.)  She also reported that plaintiff did not appear to be in any acute distress and had a normal gait.  (Id. at 325.)  She further observed that plaintiff could walk on his heels and toes without difficulty, had a normal stance, and was capable of a full squat.  (Id.)  Dr. Chow noted that plaintiff did not use any assistive devices, did not require help getting on and off of the exam table, and was able to rise from the chair without difficulty.  (Id.)  She rated his strength to be a five out of five in his upper and lower extremities.  (Id. at 327.)  She concluded that plaintiff had a "mild restriction standing, walking, and climbing stairs" as well as "reaching

overhead with the left arm." (Id. at 328.) She determined that he had "no restriction bending, lifting, or carrying." (Id.)

Additionally, Dr. Chow referred plaintiff for an x-ray of his left shoulder. (Id.) Dr. Lawrence Liebman evaluated this x-ray on September 12, 2011. (Id. at 329.) Dr. Liebman found that there was "no evidence of acute fracture, dislocation, or destructive bony lesion," but there was "an old healed angulated fracture" of the humerus and "postsurgical changes" in the clavicle. (Id.)

### b. Mental/Psychiatric Limitations

Plaintiff also attended a psychological consultative examination with Dr. Haruyo Fujiwaki on September 9, 2011. Dr. Fujiwaki noted that plaintiff complained of symptoms of depression, such as loss of energy, difficulty with concentration, crying spells, and loss of usual interests. (Id. at 321.) Dr. Fujiwaki also indicated that plaintiff denied experiencing panic attacks and manic or psychotic symptoms. (Id.) Plaintiff's "demeanor and responsiveness to questions was cooperative" and his "manner of relating, social skills and overall presentation was adequate." (Id. at 322.) Dr. Fujiwaki further reported that plaintiff's thought process was "[c]oherent and goal directed." (Id.) Dr. Fujiwaki found that plaintiff could "maintain attention with some difficulty due to depressed mood." (Id. at 323.) He concluded plaintiff could "learn new tasks" and "perform complex tasks independently." (Id.) He also asserted that plaintiff could "make appropriate decisions," and "relate with others and deal with stress to a certain extent." (Id.) He concluded that these results appeared to be "consistent with psychiatric problems, [which] may moderately interfere with [plaintiff's] ability to function on a daily basis." (Id.) He diagnosed plaintiff with depressive disorder, anxiety disorder, and alcohol and cocaine dependence, in sustained remission. (Id. at 324.)

### 4. Case Manager Mental/Psychiatric Determination

Tatiana Gueddaoui, plaintiff's case manager, completed an adult third-party function report in October 2011.  (Id. at 252–60.)  Ms. Gueddaoui noted that plaintiff reported that at times he lacked the motivation to care for his personal needs, get dressed, bathe, clean, and do heavy lifting. (Id. at 254.)  Ms. Gueddaoui noted that plaintiff's hobby was attending Narcotics Anonymous meetings and he sometimes spent time with his peers from these meetings, but not often.  (Id. at 256.) Ms. Gueddaoui also indicated that plaintiff was able to follow spoken instructions, but might have trouble remembering them.   (Id. at 257.)   In her second interview with plaintiff, Ms. Gueddaoui "established that the client [had] a mood disorder and an anxiety disorder that render[ed] the client unfit for work."  (Id. at 259.)  She witnessed that he was "tense, restless, and jumpy during the interview" and was "unable to engage in substantial gainful activity for a period of at least 12 months."  (Id. at 259–60.)

### 5. Elmhurst Hospital, Queens Health Network, and Mount Sinai Hospital

On November 28, 2011, Dr. Suzanne Bentley treated plaintiff in the Elmhurst Hospital Emergency Room.  (Id. at 393.)  Dr. Bentley noted that plaintiff was not in apparent distress and walked around the ER comfortably.  (Id.)  She conducted a musculoskeletal examination, which revealed "no gross deformities" and a "full range of motion."  (Id.)  Dr. Bentley prescribed plaintiff Percocet based on his complaints of burning pain in his right knee, left thigh, elbows, and the tops of his hips.  (Id.)

In a November 30, 2011 visit to Queens Health Network, plaintiff complained of constant burning pains in his knees, hips, and shoulders, stating that the leg pains were the most severe.  (Id. at 430.)  Plaintiff was referred to receive x-rays of his pelvis, knees, hips, elbows, and shoulders. (Id.)

Plaintiff's x-rays were analyzed during an orthopedic evaluation on December 14, 2011 at Queens Health Network. (Id. at 429.) The x-rays revealed multiple osteochondromas and the findings suggested multiple hereditary exostoses. (Id. at 387–91, 429.) A history of multiple osteochondromas was apparent in his upper and lower extremities. (Id. at 429) He was referred to a tumor clinic at Mount Sinai Hospital. (Id. at 429)

Plaintiff attended a follow-up appointment at Mount Sinai with Dr. Sheena Chandran on December 19, 2011. (Id. at 370.) At the appointment, Dr. Chandran reviewed the December 14, 2011 x-rays and plaintiff requested assistance with disability paperwork and stronger pain medication, such as Codeine, because he claimed Percocet was not relieving his pain. (Id.) Dr. Chandran found palpable masses on each of plaintiff's femurs, but noted plaintiff had full, pain-free range of motion at his knees, hips, ankles, elbows, wrists, and shoulders bilaterally. (Id.) She recommended that he see "pain management for pain control." (Id.)

### 6. Dr. Michael Moyer

On February 7, 2013, Dr. Michael Moyer, a Family Medicine doctor, examined plaintiff in order to complete a physical RFC questionnaire. (Id. at 420.) This was plaintiff's first visit with Dr. Moyer. (Id. at 421.) Dr. Moyer concluded that plaintiff's impairments caused severe limitations on his working abilities. Dr. Moyer stated that plaintiff was incapable of even low stress jobs and his symptoms were constantly severe enough to interfere with his attention and concentration. (Id. at 422.) He opined that plaintiff could sit and stand or walk less than two hours total in an eight-hour workday. (Id. at 423.) He further indicated that plaintiff would need to take unscheduled breaks during the workday and shift from sitting to standing at will. (Id.) Dr. Moyer opined that plaintiff could never lift even less than ten pounds and was likely to be absent from work more than four days per month due to his impairments and their treatment. (Id. at 424, 427.)

He reported that plaintiff could never stoop, bend, crouch, squat, or climb, and could rarely twist. (Id. at 424.)

Dr. Moyer further concluded that plaintiff's severe post-traumatic stress disorder symptoms would also significantly interfere with his ability to work at a regular job.  (Id. at 428.)

### 6. Fedcap BPS Assessment

After the ALJ hearing, members of the North Shore LIJ Medical Group conducted a Fedcap BPS Assessment of plaintiff in April and May 2013.  (Id. at 435.)   Plaintiff submitted this report to the Appeals Council as evidence accompanying his request for review of the ALJ decision.  (Id. at 432.)  Plaintiff reported that he had been homeless for about three weeks at this time.  (Id. at 437.)  He stated difficulty walking, climbing, bathing, dressing, and traveling.  (Id. at 443–45.) The doctors concluded that plaintiff was unable to lift any weight, push or pull, kneel, squat, or tolerate stress.  (Id. at 457–58.)  They found that plaintiff could only walk one block every twenty minutes.  (Id. at 458.)  The doctors' functional capacity outcome determination was that plaintiff was "unable to work" due to "constant total body pain" caused by osteochondropathy.  (Id. at 461.)

### D. Vocational Evidence

Vocational expert Devin Lessne testified at the ALJ hearing concerning plaintiff's limitations.  (Id. at 57–63.)  The ALJ posed a hypothetical to the VE based on plaintiff's vocational profile and the assumed limitations that the individual was (1) limited to occasional reaching in all directions with the non-dominant left upper extremity, (2) limited to only occasional lifting and carrying of up to twenty pounds with the non-dominant extremity, and (3) able to stay on task for ninety percent of the workday.  (Id. at 59–60.)  The ALJ asked whether there were jobs in the national economy that such an individual could perform.  (Id. at 60.)  The VE stated that plaintiff could not perform his past work as a truck driver, but also responded with two jobs serving as a

13

representative sample of the type of work available: a furniture rental consultant or a counter clerk.

(Id.)

**E. The ALJ's Decision**

The ALJ applied the five-step process, described below, pursuant to 20 C.F.R. § 404.1520 and § 416.920 and found that plaintiff was not disabled.  (Id. at 22–30.)  As described in the Discussion section, below, the ALJ was required to determine (1) whether the claimant is working, (2) whether the claimant has a "severe impairment," (3) whether the impairment is one that conclusively required a determination of disability, (4) whether the claimant is capable of continuing in his prior type of work; and (5) whether there is another type of work the claimant can do.

At the first step of the analysis, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since June 1, 2010, the alleged onset date.  (Id. at 24.)  At the second step, the ALJ found that plaintiff had severe impairments of left shoulder disorder, multiple hereditary exostoses, and post-traumatic stress disorder.  (Id.)  At the third step, the ALJ concluded that these impairments did not meet or equal any of the listed impairments that would automatically render plaintiff disabled.  (Id.)

The ALJ then addressed step four, turning first to plaintiff's RFC.  An RFC determination identifies what work a claimant can still perform, despite his limitations.  See 20 C.F.R. § 404.1545.  The ALJ concluded that plaintiff could perform "a full range of work at all exertional levels but with the following nonexertional limitations:" (1) plaintiff could occasionally reach in all directions and occasionally lift or carry up to twenty pounds with his left, non-dominant upper extremity and (2) plaintiff was required to take breaks during the day, but could stay on task ninety percent of the workday.  (Id. at 26.)

In considering plaintiff's limitations, the ALJ gave great weight to the findings of the physical consultative exam conducted by Dr. Chow because they were consistent with the weight of the medical evidence.  (Id. at 28.)  The ALJ gave little weight to the opinion of Dr. Moyer because it "was based on a one-time evaluation and [wa]s inconsistent with the rest of the medical evidence," finding that the extreme restrictions alleged by plaintiff and described by Dr. Moyer were not "shown in the record or even supported by [plaintiff's] subjective complaints to examiners."  (Id.)

The ALJ also considered plaintiff's testimony about his symptoms.  The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the [plaintiff's] statements concerning the intensity, persistence, and limiting effects" of his symptoms were "not entirely credible."  (Id. at 26–27.)  The ALJ granted little probative weight to plaintiff's testimony regarding the severity of his impairments because the "paucity of evidence [did] not support the [plaintiff's] ultimate allegation of disability."  (Id. at 28.)  The ALJ described evidence that called plaintiff's testimony into question, such as the findings by the consultative examiners, the lack of history of significant mental health treatment or psychiatric hospitalizations, and the evaluations that suggested plaintiff's impairments only had a small impact on his functioning.  (Id.)  Overall, the ALJ concluded that "[t]he level of pain alleged by the [plaintiff was] not supported by his demeanor or objective findings."  (Id. at 29.)

Based on plaintiff's RFC, the ALJ concluded at step four of the sequential process that plaintiff could not perform any of his past relevant work.  (Id.)  At the fifth step, however, the ALJ credited the VE's testimony and concluded that, given plaintiff's RFC, there were still jobs in significant numbers in the national economy that plaintiff could perform.  (Id.)  As such, the ALJ determined that plaintiff was not disabled.

## II.  DISCUSSION

### A.  Substantial Evidence and the Duty to Develop the Record

In reviewing a denial of disability benefits by the SSA, it is not the function of the district court to review the record de novo, but instead to determine whether the ALJ's conclusions "are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Perez, 77 F.3d at 41 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  Thus, the Court will not look at the record in "isolation, but will view it in light of other evidence that detracts from it."  State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990).

In a Social Security benefits proceeding, an ALJ has an affirmative duty to develop the record where there are deficiencies and "clear gaps in the administrative record." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); 20 C.F.R. § 416.912(d).[4]  However, "the flip-side of this same proposition" is that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek

---

[4] In 2017, new SSA regulations came into effect. The newest regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claim was filed before that date, the Court applies the regulations that were in effect at the time of filing.  See, e.g., Ogirri v. Berryhill, No. 16-CV-9143, 2018 WL 1115221, at *6 n.7 (S.D.N.Y. Feb. 28, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); Rousey v. Comm'r of Social Sec., No. 16-CV-9500, 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (same).

additional information in advance of rejecting a benefits claim." <u>Petrie v. Astrue</u>, 412 F. App'x 401, 406 (2d Cir. 2011) (quoting <u>Rosa</u>, 168 F.3d at 79 n.5).  The ALJ's duty to develop the record exists even when a claimant is represented by counsel.  <u>Rosa</u>, 168 F.3d at 79.

## B.  Analysis

Plaintiff asserts that the ALJ erred in determining his RFC by failing to develop the record more fully regarding the effects of his tumors.[5]  (Cross-Mot. J. Pleadings, ECF No. 13.)  Plaintiff argues that the ALJ should have "ordered another examination of the claimant by a medical expert specializing in the treatment of multiple osteochondromas in order to address this gap in the medical record."  (<u>Id.</u> at 8.)  According to plaintiff, this expert would be in the "best position" to review plaintiff's x-rays, examine plaintiff, and render an opinion.  (<u>Id.</u>)  Plaintiff asserts that retaining such an expert was particularly warranted in this case because he "was homeless and lacked medical insurance that would have made consistent treatment possible and that might have helped the ALJ render a determination based on a complete record."  (<u>Id.</u> at 8–9.)

Plaintiff's arguments are not persuasive—the ALJ did not err as the record was adequately developed.  The record consisted of treatment notes from numerous providers evaluating plaintiff's orthopedic complaints.[6]  The record from Elmhurst Hospital shows that plaintiff was "walking around the ER comfortably" and had a full range of motion with no gross deformities.  (<u>Id.</u> at 393.)  During his examination at Mount Sinai, the doctor noted plaintiff had full, pain-free range of motion at his knees, hips, ankles, elbows, wrists, and shoulders bilaterally.  (<u>Id.</u> at 370.)

---

[5] Plaintiff does not raise any arguments related to his mental/psychiatric limitations or his injured left shoulder.

[6]  Dr. Moyer also considered the effects of plaintiff's tumors in his opinion on plaintiff's functional limitations.  (Tr. at 421–28.)  Although the ALJ gave his opinion "little weight," the ALJ properly considered his opinion, and by extension, the effects of plaintiff's tumors in the context of the entire medical record.

Plaintiff asserts that the ALJ should have ordered another examination in order to evaluate the x-rays plaintiff brought to the hearing.  (Cross-Mot. J. Pleadings at 8.)  During the hearing, however, the ALJ offered to allow plaintiff to retain an expert or to instruct SSA to order another examination.  (Tr. 38.)  Plaintiff's attorney declined this offer and acknowledged the complete nature of the record with respect to the tumors, stating that "[t]here [was] a lot of evidence in the record concerning the tumors," so he felt "that it probably would not be necessary to supplement the record with anything given the fact that there [was] already a lot there"  (Id. at 38.)  Indeed, the record already contained an interpretation of x-rays of plaintiff's pelvis, knees, hips, elbows, and shoulders completed during an orthopedic evaluation on December 14, 2011 at Queens Health Network.[7]  (See id. at 429.)

Furthermore, the ALJ already ordered a physical consultative examination with Dr. Chow, although he was not necessarily required to do so.  See Tankisi v. Comm'r of Soc. Sec., 521 F. App'x. 29, 32 (2d Cir. 2013) ("[A]n ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it.").  Plaintiff informed Dr. Chow about his condition and she noted the incision scars from his surgery as well as "palpable bony growths" in both elbow regions.  (Id. at 328.)  Dr. Chow took these into account in concluding that plaintiff had only a "mild restriction standing, walking, and climbing stairs," as well as "reaching overhead with the left arm," and "no restriction bending, lifting, or carrying."  (Id. at 328.)

Here, the record before the ALJ contained medical opinions, treatment notes, as well as an analysis of plaintiff's x-rays.  The ALJ was not obligated to seek further information,

---

[7] It is unclear from the record whether the x-rays plaintiff's counsel brought to the hearing were the same x-rays taken in December 2011 or were a new set of x-rays.  Plaintiff's counsel did not identify when these x-rays were taken.  It is, however, notable that the only reference to any such x-rays in the record concerns x-rays taken in December 2011, suggesting that the x-rays brought to the hearing by counsel were the December 2011 x-rays.  In any event, even assuming for the sake of argument that the x-rays brought by plaintiff's counsel were new films, that would not alter the Court's determination herein.

particularly given that plaintiff's counsel declined the ALJ's invitation to expand the record. Cf.
O'Dell v. Colvin, No. 16-CV-368, 2016 WL 6882861 (S.D.N.Y. Nov. 22, 2016) (stating that there
was no duty to develop the record when the ALJ was able to refer to multiple doctors' reports and
plaintiff's testimony during his hearing, and when plaintiff's counsel stated that the ALJ possessed
all of the relevant medical evidence).

An additional opinion about the x-rays and plaintiff's condition was also not necessary
because the ALJ accepted that plaintiff had multiple osteochondromas and the record does not
suggest that such an additional opinion was likely to be probative of a more limited functional
capacity. Plaintiff has had these osteochondromas all of his life, and prior to the plaintiff's tragic
truck accident in June 2010, plaintiff was able to work with this condition despite any pain it
caused.[8] There is little evidence in the record suggest that plaintiff's osteochondromas or the pain
from that condition has substantially worsened over time, or worsened after the December 2011
x-rays.

Plaintiff was diagnosed with this disorder as a child, (Tr. 48), and plaintiff indicated in a
written function report that he has had "pain all his life" and that it affected his activities "all his
life." (Tr. 231.) Even the FEGS Biophyscosocial Summary prepared on May 24, 2011 indicates
that plaintiff has had "intermittent" pain for 5 years. (Tr. 516.) Plaintiff also reported to Dr. Chow

---

[8] Plaintiff's counsel represented at the hearing that plaintiff operated an 18-wheeler for approximately 11 years. (Tr.
40; see also Tr. 209 (record indicating that Plaintiff worked as a truck driver from 1999 to 2010)). Plaintiff's earning
records indicate substantial earnings between 2003 and 2006, but only reflect plaintiff earning approximately $500 a
year in 2007 and in 2010 before his accident. (Tr. 173.) Plaintiff, however, reported to Dr. Fujiwaki that he "last
worked in [June 2010] as a tractor trailer driver for six months." (Tr. 321.)

Thus, the evidence concerning plaintiff's work history, despite being somewhat contradictory, indicates that
plaintiff's work history is more robust than the earnings records reflect, including a substantial amount of time worked
in 2010. (In any event, even assuming that plaintiff only worked during the time periods reflected in the earning
records, even those records show that he was working as recently as 2010 when the truck accident occurred.) Nothing
in the record suggests that the pain from plaintiff's osteochondromas precluded him from driving a truck in 2010.
Rather, the record indicates that the truck accident in 2010 led to a tragic downward spiral in plaintiff's life—not that
the pain from his osteochondromas suddenly worsened.

that he had pain in his elbows, hips, and knees "for the past few years." (Tr. 325.) There is evidence, however, that, at the very least, plaintiff performed substantial amounts of work in both 2006 and 2010, during the time periods when he was experiencing the pain reported above.

At the hearing, plaintiff admitted that he dealt with this "sort of pain" when he was driving a truck, adding that "I was more tolerable to it at that time, you know, because I took a little bit of, like, some ibruprofen's or something to go to sleep, but never take medicine as I'm driving and stuff like that." (Tr. 49.) At the hearing, plaintiff also stated that he had sought "codeine because the Motrins and ibruprofens wasn't working for a long period of time," indicating that, to the extent there was increased pain, he had been experiencing such pain for a "long period of time." (Tr. 50.) Yet, plaintiff still worked as a driver until June 2010 and only stopped after the fatal accident.

Finally, the nature of plaintiff's condition makes it unlikely that an additional opinion concerning would have been probative of a more limited functional capacity. Plaintiff's brief cites to an overview of osteochondromas from www.merckmanuals.com. This site indicates, inter alia, that: "These tumors manifest most often in people aged 10 to 20 and may be single or multiple. . . . Secondary malignant chondrosarcoma develops . . . in an about 10% of patients with multiple osteochondromas." (Cross-Mot. J. Pleadings at 4.) This site also notes that "An enlarging tumor in an adult should raise concern of chrondrosarcoma and the possible need to excision or biopsy." (Id.)

Other medical sites, including the National Institutes of Health, provide similar information about plaintiff's disorder, noting:

- "The bony growths that characterize this disorder continue to grow until shortly after puberty at which time normally new growth no longer develops." (https://rarediseases.org/rare-diseases/hereditary-multiple-osteochondromas/)

- "Once a child has reached skeletal maturity, the osteochondroma typically stops growing, too."
  (https://orthoinfo.aaos.org/en/diseases--conditions/osteochondroma)

- "[O]steochondromas are not present at birth, but approximately 96 percent of affected people develop multiple osteochondromas by the time they are 12 years old."
  (https://ghr.nlm.nih.gov/condition/hereditary-multiple-osteochondromas)

- "Osteochondromas typically grow throughout childhood and stop growing when the growth plates close.  However, they do recur later on in some people."
  (https://rarediseases.info.nih.gov/diseases/7035/hereditary-multiple-osteochondromas#ref_14902)

The website information provided by plaintiff (and corroborated by the other websites above) suggests that, absent plaintiff developing a malignant chondrosarcoma, it is unlikely that the plaintiff's osteochondromas, which he has had all of his life, would expand.  There is no evidence indicating that plaintiff developed malignant chondrosarcomas.  There is also no evidence that the doctor who reviewed the December 2011 x-rays, Dr. Chandran, was concerned that plaintiff had developed malignant chondrosarcomas.  (See also Tr. 48 (plaintiff's testimony at hearing that female doctor told him that if "you don't keep updated with them and keep coming back and forth to the doctor that [benign tumors] can become cancer," implying that she did not believe he currently had malignant chondrosarcomas).)

There is little reason to suspect a material change in plaintiff's condition.  In fact, as explained earlier, there is ample evidence in the record that plaintiff's condition has not substantially changed from the time that he was working.  As such, the ALJ did not have to seek an additional medical opinion concerning plaintiff's osteochondromas and the x-rays produced at the hearing in order to adequately assess plaintiff's application for disability

Accordingly, the record here was sufficiently developed and the ALJ's decision was supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons defendant's motion for judgment on the pleadings is GRANTED

and plaintiff's cross-motion for judgment on the pleadings or remand is DENIED.  The Clerk of

Court is directed to enter judgment in favor of defendant and to close this case.

Dated:  March 31, 2019
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE